## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

**FLEET ENGINEERS, INC.**
      a Michigan Corporation,

      Plaintiff

v.

**MUDGUARD TECHNOLOGIES, LLC**
      a Tennessee limited liability company,
**TARUN SURTI**
      an Individual,

      Defendants.

Case No. 1:12-CV-1143

Hon. Paul L. Maloney

## FLEET'S TRIAL BRIEF

# TABLE OF CONTENTS

I.      Introduction ................................................................................................... 1

II.     Facts ............................................................................................................... 1

    A.      The Parties' Early Relationship ......................................................... 1

    B.      Prior Art ............................................................................................. 4

    C.      Mr. Surti's '949 Patent ..................................................................... 6

    D.      Fleet's AeroFlap® Product ................................................................ 9

    E.      Pre-Litigation Communication Between the Parties.......................... 11

    F.      Mr. Surti's '755 Patent ..................................................................... 11

    G.      Assertion of Patent Claims Allegedly Infringed by Fleet ................. 12

    H.      *Markman* Proceedings ....................................................................... 12

    I.      Expert Testimony .............................................................................. 13

III.    Non-Infringement of Asserted Claims............................................................ 13

    A.      Applicable Law................................................................................... 14

    B.      Application of Law to Facts................................................................ 14

    C.      Fleet Did Not Willfully Infringe the '755 Patent ............................... 17

IV.     Damages.......................................................................................................... 19

    A.      Mr. Surti Cannot Make a Case for Lost Profits ................................. 19

    B.      Mr. Surti May Recover a Reasonable Royalty ................................... 19

V.      Conclusion ...................................................................................................... 22

# INDEX OF AUTHORITIES

**Cases**

*Markman v. Westview Instruments, Inc.*
  52 F.3d 967 (Fed. Cir. 1995)(en banc), *aff'd,* 51 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ................................................................................................................................. 14

*Seattle Box Co. v. Indus. Crating & Packing, Inc.*
  731 F.2d 818 (Fed. Cir. 1984) ................................................................................................... 12

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*
  442 F.3d 1322 (Fed. Cir. 2006) ................................................................................................. 14

*ZMI Corp. v. Cardiac Resuscitator Corp.*
  844 F.2d 1576 (Fed. Cir. 1988) ................................................................................................. 14

Pursuant to paragraph 8(a)(ii) of the Case Management Order, Plaintiff Fleet Engineers, Inc. ("Fleet") submits the following trial brief.

## I.      INTRODUCTION

Fleet sued Defendants Mudguard Technologies, LLC ("Mudguard") and Tarun Surti ("Mr. Surti") (collectively "Defendants") for a declaratory judgment of non-infringement and invalidity of U.S. Patent No. 8,146,949 ("the '949 Patent"), reissued as U.S. Reissue Patent No. RE44,755 ("the '755 Patent"), based on the AeroFlap® brand mud flap products sold by Fleet. Defendant Mudguard has been dismissed from this action and judgment has entered on all claims but the cross-claims of patent infringement/non-infringement.

Fleet asserts that its AeroFlap® brand product does not infringe any of the asserted claims because it does not contain vanes that protrude from the front side of the mud flap. Further, it does not contain vertically extending channels and openings that direct water toward the ground.

## II.      FACTS

### A.      THE PARTIES' EARLY RELATIONSHIP

On April 20, 2010, Mr. Surti, as President of Mudguard, contacted Fleet about a mud flap called the "V-Flap" (the "V-Flap Product"), as shown below:



**FIGURE 1**
*ECF No. 99, PageID.791*

**FIGURE 2**
HTTP://WWW.VFLAP.COM/V-FLAP/PHOTOS.HTML

The V-Flap Product is an injection molded mud flap with vertical slots positioned in horizontal rows. Several protruding vanes run vertically along the entire length of the front side (the side that faces the wheel) of the V-Flap Product with the slots located in channels between the vertical vanes.



**FIGURE 3 – ANNOTATED FIG. 1 OF '949 PATENT**

2

Per Mr. Surti and the V-Flap Product literature, the vertical vanes perform a "separation" function, meaning that the vanes separate water and debris from air so that air can pass through the vertical slots and water and debris can run down the channels created by the vertical vanes. *ECF No. 187, PageID.1892-1894,, Surti Dep. Trans. at 188:24-193:16; ECF No. 187, PageID.1900, Surti Dep. Ex. 39.* The stated purpose of this separation function is to reduce the spray and splash from truck wheels, which may impair the visibility of the driver behind the truck, thus decreasing driver visibility. *ECF No. 187, PageID.1908, '949 Patent, Col. 1, lines 32-35.*

On April 28, 2010, Fleet and Mudguard entered into a Confidentiality and Non-Competition Agreement. *ECF No. 187, PageID.1912, Surti Dep. Ex. 8.* Over the next several months, Fleet provided in-depth guidance to Mr. Surti, the parties eventually reached an agreement, and Mudguard and Fleet entered into a Distributor Agreement on July 20, 2010. *Ecf No. 99, PageID.783-789, Distributor Agreement*

Fleet tested the V-Flap product from July 20, 2010, to September 27, 2010. While initial product samples tested by Fleet were acceptable, a full production run of the V-Flap Product did not meet Fleet's quality control standards. *ECF No. 187, PageID.1884-1888, Affidavit of Wesley K. Eklund, ¶11; ECF No. 187, PageID.1945-1963, Surti Dep. Exs. 14, 15, FLEET000900-904, FLEET000905-915.* Specifically, when using Fleet's product testing techniques, the V-Flap Product cracked and broke in several trials, such as shown below. *ECF No. 187, PageID.1885, Affidavit of Wesley K. Eklund, ¶12, 13.*

3



**FIGURE 4 – PAGEID.1955, FLEET000910;**
*ECF No. 187, PageID.1885, Affidavit of Wesley K. Eklund, ¶13.*

Although Fleet and Mr. Surti had lengthy exchanges about the method of testing for the V-Flap Product, Fleet ultimately concluded that it could not sell a faulty product to its customers. *ECF No. 187, PageID.1885, Affidavit of Wesley K. Eklund, ¶14.* The relationship between Fleet, Mr. Surti and Mudguard was terminated by Mr. Surti on September 30, 2010. *ECF No. 187, PageID.1965-1969, Surti Dep. Ex. 25, FLEET000860-864.*

**B.     PRIOR ART**

The '949 Patent (and the subsequent '755 Patent at issue that ultimately replaced the '949 Patent) attempts to solve a relatively simple problem. Traditional mud flaps (made from a large rubber panel) fail to adequately block the spray of water, mud, and other debris from wheels on a wet roadway. *ECF No. 187, PageID.1971-1980, '755 Patent, Col. 1, lines 12-15.* These traditional solid-panel mud flaps can "sail" at higher speeds, meaning that the mud flaps swing upward and outward from the wheels, allowing a spray of water and debris to reduce the visibility of the driver behind a vehicle with solid-panel mud flaps. *ECF No. 187, PageID.1978., Col. 1, lines 17-20.*

Several patents prior to Mr. Surti's '949 Patent already contemplated solutions to this problem by attempting to avoid this "sailing" effect with mud flaps containing slots to let air flow through them, while preventing water and debris from passing through them. *Id., Col. 1, lines 21-27*. U.S. Patent No. 6,851,717 issued on February 8, 2005, to Andersen ("Andersen '717 Patent") is one such attempt. *ECF No. 28, PageID.290-307, Andersen '717 Patent*. While the drawings in the Andersen '717 Patent show horizontal channels, the



**FIG. 1 OF PRIOR ART ANDERSEN '717 PATENT**

invention does not require that its openings be arranged horizontally. Instead, strands on the mud flap can be arranged in a variety of ways:

> the strands of the "integrally-formed, mesh panel" may be arranged in a substantially orthogonal grid pattern such that there are a plurality of substantially parallel, horizontally-disposed strands and a plurality of substantially parallel, vertically-disposed strands. It is also contemplated that the strands of the "integrally-formed, mesh panel" may be arranged such that they are all substantially parallel to each other, in either a substantially horizontal or a substantially vertical arrangement.

*ECF No. 28, PageID.302, Col. 1, lines 48-57.*

5

Another attempt to address the solid-panel mud flap "sailing" problem is U.S. Patent No. 5,273,318 issued on December 28, 1993, to Nakayama ("Nakayama '318 Patent").*ECF No. 23,* PageID.200-213*, Nakayama '318 Patent.* The Nakayama '318 Patent is for a mud flap that prevents spray from a vehicle wheel with a number of channels created from a series of lateral and vertical slots that form slotted openings to allow air to pass through such openings, as shown in its Figure 2. The Nakayama '318 Patent also discloses a second panel that



**FIG. 2 OF PRIOR ART NAKAYAMA '318 PATENT**

is behind the mud flap, which the water and debris hits as it moves through the slotted mud flap panel and which allows such water and debris to slide downwardly toward the road surface.

## C.   MR. SURTI'S '949 PATENT

On September 2, 2009, Mr. Surti filed a patent application entitled "MUD FLAP," that issued as the '949 Patent on April 3, 2012. *ECF No. 187, PageID.1902-1910, '949 Patent.* Per U.S. Patent Office records, Mr. Surti never assigned his rights in the '949 Patent to Defendant Mudguard.

Claim 1 and Figures 1 and 5 of the '949 Patent are shown below (*emphasis added*):

| | |
|---|---|
| A mudflap for preventing spray from a wheel of a vehicle on a wet roadway from impairing the vision of drivers of other vehicles, comprising a vertically extending flap which is mounted to the rear of the wheel with a front side of the flap facing the wheel and a rear side facing away from the wheel, ***a plurality of laterally spaced, vertically extending vanes defining a plurality of vertically extending channels*** on the front side of the flap for directing water and debris from the wheel in a downward direction toward the ground and | |

6

not to the rear or sides of the flap, and ***vertically extending slotted openings in the channels of a size permitting air to pass through the openings to the rear of the flap and preventing water and debris from doing so***.



"Vertically extending" vanes

Only "air" passes through

During prosecution, the U.S. Patent Office rejected claim 1 of the '949 Patent based on the Nakayama '318 Patent. According to the Patent Examiner, the Nakayama '318 Patent disclosed a mud flap including vertical channels with "vertically extending slotted openings in said channels of a size permitting air to pass through while preventing water and debris from passing through (Figs. 7 and 13, item 7 & column 4, lines 13-33)." *ECF No. 23, PageID.219, Non-Final Rejection at Page 4.*

FIGS. 7 to 9 show modifications of the front member 1 consisting of the lateral members 6 and the longitudinal members 8 positioned in front of the members 6. Although in these figures, longitudinal members 8 in triangular cross section are employed, ones quite round or oval in cross section may be used. The same applies to the lateral members 6.



In the front member 1 shown in FIG. 10, membranes 9 are fitted on the front side of the longitudinal member 8 of triangular cross section and are to be bent backward by hydraulic pressure of muddy water splashed by the tire as illustrated in FIG. 11 surface films 9 are to be bent backward by the. The membranes 9 as mentioned above may be fitted onto the backside of the longitudinal members 8 (see FIG. 12). Further, the membranes 9 may be fitted on the top of the lateral members 6 situated on the front side or on the base of the members 6 situated on the backside in order to cover part of the openings 7. The presence of the membranes 9 is effective for reducing rebounding of muddy water.



NAKAYAMA '318, COL. 4, LINES 13-33, FIGS. 7 & 13

Mr. Surti countered the rejection by claiming his invention was a "single flap with openings of a size that permits air to pass through the openings to the rear of the flap **but prevents water and debris from doing so**." *ECF No. 23, PageID.227, Amendment and Response at Page 5 (emphasis added).* The Examiner rejected this argument and issued a Final Rejection based on the Nakayama '318 Patent. Mr. Surti submitted a Request for Reconsideration, arguing that his invention distinguished over the Nakayama '318 Patent because it has "openings that pass air and **block water and debris** …" *ECF No. 23, PageID.243, Amendment and Response at Page 6 (emphasis added).* The patent was ultimately allowed.

Based on the claim language and Mr. Surti's arguments, therefore, it is clear that a critical feature of his '949 Patent is that the mud flap's vertical channels and openings allow air – but not water and debris – to pass through the flap and redirect water and debris impinging on the flap toward the ground.

## D.   FLEET'S AEROFLAP® PRODUCT

In 2011 and 2012, Fleet designed its own mud flap, called the AeroFlap®. Fleet introduced the AeroFlap product at a trade show in February 2012 (nearly 17 months after Mr. Surti terminated the Distribution Agreement between Fleet and Mudguard). *ECF No. 169, PageID.1575-1579, Affidavit of Wesley K. Eklund, ¶9.* Importantly, Fleet did not use any information obtained from Mr. Surti or Mudguard in designing and developing its AeroFlap product. *ECF No. 187, PageID.1887, Affidavit of Wesley K. Eklund, ¶20.*

The AeroFlap mud flap includes two main sections: an upper section and an optional lower section. The upper section is essentially a square that is divided into four equally-sized and separate squares, or quadrants. Each of the equally-sized quadrants has a series of slots arranged at a 45-degree angle. The optional lower section of the mud flap can include rows of vertical slots. *ECF No. 187, PageID.1886, Affidavit of Wesley K. Eklund, ¶15.*

Figure 5 below is an excerpt of Fleet's product catalog and shows a CAD drawing of Fleet's AeroFlap product and a photograph of the product. These figures also show the upper and lower sections of the AeroFlap design. *ECF No. 187, PageID.1886, Affidavit of Wesley K. Eklund, ¶16.*



**FIGURE 5**
**CAD DRAWING OF THE AEROFLAP & PRODUCT PHOTO (FLEET 000001)**
Figure 6 below is a *side view* of Fleet's mud flap, which demonstrates that nothing

protrudes laterally from the body of the mud flap. *ECF No. 187, PageID.1886, Affidavit of*

*Wesley K. Eklund, ¶17.*



**FIGURE 6**
*ECF No. 187, PageID.1886, Affidavit of Wesley K. Eklund, ¶17.*
Fleet offers several sizes and configurations of its AeroFlap mud flap, with the primary

versions shown in Figure 7 below. *ECF No. 187, PageID.1886, Affidavit of Wesley K. Eklund,*

*¶18.*


Part No. 033-08001
24" x 24" AeroFlap


Part No. 033-08002
24" x 30" AeroFlap


Part No. 033-08004
24" x 36" AeroFlap

**FIGURE 7 -** http://www.fleetengineers.com/mudflap033-08001.html;
*ECF No. 187, PageID.1887, Affidavit of Wesley K. Eklund, ¶18.*

10

E.       PRE-LITIGATION COMMUNICATION BETWEEN THE PARTIES

From June through September 2012, Mr. Edward S. Wright, Mr. Surti's counsel at the time, and Mr. John McGarry, Fleet's outside patent counsel, exchanged a number of letters regarding the '949 Patent and Fleet's AeroFlap product. PapageID.793-822. Mr. McGarry fully responded to the infringement allegations in his September 4, 2012, letter, noting that the Fleet "AeroFlap mudflap does not have the critical vertical vanes in any section of the mudflap and does not have openings that are designed to pass air but not water to the other side." PageID.817.

On October 16, 2012, Fleet learned that Defendants issued an "open letter" (*ECF No. 99, PageID.824*) to Fleet's customers that purchased Fleet's AeroFlap product, as shown below.



As a result of Mr. Wright's allegations of infringement and Mudguard's "open letter" to users of the AeroFlap mud flap product, Fleet filed this lawsuit on October 19, 2012.

F.       MR. SURTI'S '755 PATENT

Several months into this litigation on March 18, 2013, Mr. Surti filed a Request for Reissuance of the '949 Patent with the U.S. Patent Office. U.S. Reissue Patent No. RE44,755

issued February 1, 2014 ("the '755 Patent"). *ECF No. 99, PageID.810-813, '755 Patent.* The

'755 Patent contains 25 claims: claims 1-17 are identical to claims 1-17 of the '949 Patent;

claims 18-25 are new.

When a reissue patent is issued, the original patent is surrendered, and the original patent

can no longer be infringed. *Seattle Box Co. v. Indus. Crating & Packing, Inc.,* 731 F.2d 818, 827

(Fed. Cir. 1984) ("*Seattle Box I*").  Consequently, the '755 Patent has effectively replaced the

'949 Patent as the patent in suit. Fleet filed its First Amended Complaint on October 16, 2014, to

request declaratory judgment of non-infringement and invalidity of the '755 Patent in place of

the '949 Patent. *ECF No. 99, PageID.759-841.* As such, the '755 Patent is now the patent-in-suit.

## G.   ASSERTION OF PATENT CLAIMS ALLEGEDLY INFRINGED BY FLEET

The original Case Management Order issued in this case called for the claims of the

patent alleged to be infringed to be disclosed by April 1, 2013. *ECF No. 13, PageID.122-129.*

Mr. Surti and Mudguard timely filed their Statement of Claims Infringed and Infringing

Products, asserting that Fleet's sale of all AeroFlap® products infringed claims 1, 2, 5, 8, 9, and

13 of the '949 Patent. *ECF No. 20,* PageID.159-16*0.* Claims 1, 2, 5, 8, 9, and 13, also appear in

the '755 Patent. Mr. Surti never supplemented the claim assertion with any additional or fewer

claims. This Court has entered an order clarifying that the only claims at issue are claims 1, 2, 5,

8, 9, and 13 of the '755 Patent. *ECF No. 299, PageID.3458-3461.*

## H.   *MARKMAN* PROCEEDINGS

The parties conducted *Markman* proceedings by submitting briefs to the Court during

April-July 2013. *ECF No. 23, PageID.167-188, ECF No. 28,* P*ageID.265-288, ECF No. 35,*

*PageID.317-329.* The Court conducted a *Markman* hearing on September 9, 2013. *ECF No. 40,*

*PageID.343.* On December 10, 2013, the Court issued its claim construction opinion. *ECF No.*

*60, PageID.386-400.*

At the end of its claim construction opinion (*Doc #60)*, the Court provided a summary of its findings:

> Having carefully examined the claim and specification language, the Court has concluded how each of the disputed phrases should be interpreted. The patent does require the vanes and channels run perpendicular to the road surface. The patent does not require the vanes and channels to run the length of the mud flap without interruption. Finally, the patent does not require the slotted openings to be of a size that stops all water and debris from flowing through them.

*PageID.400.*

Following summary judgment briefing, the Court also determined that vane means "a relatively thin, rigid structure, like a blade, that is attached to another structure or surface" and "must protrude or rise from the rear wall of the mud flap." *ECF No. 236, PageID.2833-2834.*

## I.    EXPERT TESTIMONY

In support of its position on non-infringement of originally the '949 Patent and now the '755 Patent, Fleet retained the services of an experienced patent attorney, Thomas N. Young, of the firm Young Basile Hanlon & MacFarlane P.C. of Troy, Michigan. In his report, Mr. Young concludes that the claims of the patent-at-issue are not infringed.

To rebut Mr. Surti's untenable damages claims, Fleet also retained the services of an experienced damages expert, Philip Kline of Ankura of Ann Arbor, Michigan. In his report, Mr. Kline concludes that Mr. Surti greatly overstates his damages amount, and expects to testify that Mr. Surti should be entitled to a maximum of $120,000 should infringement be found.

## III.    NON-INFRINGEMENT OF ASSERTED CLAIMS

Fleet's AeroFlap® product does not infringe the '755 Patent because the AeroFlap® product does not include protruding vanes in its design, as further explained below.

A.    **APPLICABLE LAW**

To establish a claim of infringement, Mr. Surti must establish that each and every

element set forth in the patent claims must be found in the accused product. *ZMI Corp. v.*

*Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578 (Fed. Cir. 1988). A utility patent infringement

claim is analyzed in a two-step process: "claim construction, and application of the construed

claim to the accused process or product." *Wilson Sporting Goods Co. v. Hillerich & Bradsby*

*Co.,* 442 F.3d 1322, 1326 (Fed. Cir. 2006), *Markman v. Westview Instruments, Inc.,* 52 F.3d 967,

976 (Fed. Cir. 1995)(en banc), *aff'd,* 51 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

B.    **APPLICATION OF LAW TO FACTS**

To the extent the claims of the '755 Patent require protruding vanes as per its

specification, there is one feature of the claims of the '755 Patent that the Fleet AeroFlap®

product does not have: vanes that protrude from the front face of the flap. In fact, the AeroFlap®

product does not have vanes on the front face of the flap that go in any direction.

The '755 Patent has several references to "vanes" in the specification and drawings.

These "vanes" (as shown by reference numeral 21 in the drawings of the '755 Patent) ostensibly

protrude from the face of the mud flap panel:

- "A plurality of vertically extending channels 19 are formed between *laterally spaced vanes* 21 on the front side of the panel for carrying water, mud and other debris in a downward direction and preventing it from being thrown into the path of other vehicles." *ECF No. 187, PageID.1978, Surti '755 Patent, Col. 2, lines 26-30* (*emphasis added*) (if the vanes had a height of zero, there would be nothing to "laterally space").

- "The vanes are tapered, with the lateral surfaces 22 of the vanes on opposite sides of each of the channels being inwardly and rearwardly inclined relative to each other to direct air, water and debris into the channels." *ECF No. 187, PageID.1978, Col. 2, lines 30-33.*

- "The front edges, or noses, of the vanes are rounded." *ECF No. 187, PageID.1978, Col. 2, lines 33-34.*

- "The vanes are spaced apart by a center-to-center distance on the order of 0.5 inch and extend on the order of 0.25 inch from the front side of the panel." *ECF No. 187, PageID.1978, Col. 2, lines 38-41.*

- "However, it will be understood vanes can have any degree of taper and height that will funnel the air, water, and debris into the channels and prevent it from being thrown off to the sides of the flap." *ECF No. 187, PageID.1978, Col. 2, lines 41-44.*

- "In use, the mud flap is mounted in a vertical position to the rear of a wheel, with channels 19 and vanes 21 facing the wheel." *ECF No. 187, PageID.1978-1979, Col. 2, line 66-col. 3, line 1* (if the vanes were not protruding from the mud flap panel, it would presumably not matter which side of the mud flap faced the wheel).

- "The ***protruding*** vanes prevent water and debris from being deflected to the sides of the mud flap, while their inclined side surfaces effectively funnel the water and air into the channels and keep it there." *ECF No. 187, PageID.1979, Col. 3, lines 21-24* (*emphasis added*).

By way of comparison, the Fleet AeroFlap product does not contain anything that could be construed as a "vane." The AeroFlap product is a flat mud flap with several series of formed openings. When looked at from a bottom or top view (or even a side view, for that matter), the AeroFlap looks nothing like the side view of the drawings in the '755 Patent because it has no vanes:



**FIGURE 9 - SIDE VIEW OF AEROFLAP® (NO INDICATION OF VANES)**

As compared to the '755 Patent, e.g., Figure 2:



**FIG. 2 OF THE '755 PATENT (NUMERAL 21 – VANES)**

15

Because the Fleet AeroFlap does not include protruding vanes, or an equivalent thereof, the Fleet AeroFlap does not read on independent claims 1 and 9 of the '755 Patent, which contemplate such protruding vanes. Moreover, because the asserted dependent claims (2, 5, 8 and 13) inherently include the "laterally-spaced vanes" limitation because of their corresponding independent claims, the Fleet AeroFlap does not infringe the '755 Patent.

Claims 1 and 9 of the '755 Patent call for a series of "***vertically extending slotted openings***." *ECF No. 187-10, PageID#.979-1980* (*emphasis added*).  As this Court found in its claim construction opinion, "vertically extending" means "perpendicular or at a 90 degree angle to the road surface." *ECF No. 60, PageID.395.*  Thus, any openings of the Fleet AeroFlap product ***that are not at a 90 degree angle to the road surface*** do not meet the literal limitations of Claim 1 of the '755 Patent.

Any openings of the AeroFlap product that are not at a 90 degree angle to the road surface do not meet the literal limitations of Claim 1 of the '755 Patent and are not "vertically extending" openings because the *Markman* order construed "vertically extending" to mean "perpendicular or at a 90 degree angle to the road surface." As shown above, the 24" AeroFlap (Part No. 033-08001) has no vertical openings.  The 30" and 36" versions (Part No. 033-08002 and Part No. 033-08004) only have vertical openings at a lower edge, with the four quadrant angled openings occupying the entire upper and middle portion of the AeroFlap.  Therefore, because all of the slotted openings of the AeroFlap are not "vertical" as required by the '755 Patent, the AeroFlap cannot literally infringe any asserted claim of the '755 Patent.

Because the Court construed vertical to mean vertical (i.e., perpendicular to the road surface), there is no other breadth in these "vertical" claim elements that could be addressed

under the doctrine of equivalents. Therefore, Defendant Surti's arguments under the doctrine of equivalents should fail as well.

As to the "vertically extending channels" limitation, for the same reasons that the Fleet AeroFlap product does not include vanes, it cannot contain channels as the vanes define the channels. Second, and for the same reasons that the Fleet AeroFlap product does not contain the "slotted openings" as required by Claims 1 and 9 of the '755 Patent, the AeroFlap also does not contain "vertically extending channels."

Because the Fleet AeroFlap product does not include vertically extending channels, or an equivalent thereof, Fleet's product does not read on independent claims 1 and 9 of the '755 Patent, which specifically contemplate such vertically extending channels. Moreover, because the asserted dependent claims (2, 5, 8 and 13) inherently include the "vertically extending channels" limitation (because of their corresponding independent claims), the Fleet AeroFlap does not infringe the '755 Patent.

## C.   FLEET DID NOT WILLFULLY INFRINGE THE '755 PATENT

"Awards of enhanced damages under the Patent Act …are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, --- U.S. ---, 136 S. Ct. 1923, 1932 (2016). Accordingly, "conduct warranting enhanced damages" is limited to that which is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate." *Id*.

Courts are to exercise their discretion in deciding whether to apply enhanced damages in patent infringement suits, and "are to be guided by the sound legal principles developed over nearly two centuries of application and interpretation of the Patent Act." *Id*. at 1935 (internal quotations omitted). Although not required as part of the analysis, the factors set out in the

17

Federal Circuit's *Read Corp. v. Portec, Inc.,* 970 F.2d 816 (Fed. Cir. 1992), are helpful in

considering whether infringement was willful and enhanced damages are appropriate. These

factors include "whether the infringer deliberately copied the ideas or design of another,"

"whether the infringer, when he knew of the other's patent protection, investigated the scope of

the patent and formed a good-faith belief that [the patent] was invalid or that it was not

infringed," "the infringer's behavior as a party to the litigation," the infringer's "size and

financial condition," the "closeness of the case," the "duration of [the] defendant's misconduct,"

"remedial action by the defendant," the "defendant's motivation for harm," and "whether [the]

defendant attempted to conceal its misconduct" such as, for example, committing spoliation. *Id.*

at 827.

"[A]n award of enhanced damages does not necessarily flow from a willfulness finding."

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,* 875 F.3d 1369, 1382 (Fed. Cir. 2017)

(affirming decision not to award enhanced damages despite jury finding of willfulness). Instead,

"[d]iscretion remains with the court to determine whether the conduct is sufficiently egregious to

warrant enhanced damages," and "courts should consider the overall circumstances of the case."

*Id*.

The overall circumstances of this case do not warrant a finding of willfulness, let alone

enhanced damages. Fleet set out to make a product different from Mr. Surti's. Fleet consulted

with its patents counsel and identified differences between the Fleet's product and the '755 Patent

claims.

There is no evidence that Fleet intended to infringe Mr. Surti's rights. At all times, Fleet

tried to make a product that was outside the scope of the '755 Patent claims. Fleet behaved

reasonably in the case, provided to Mr. Surti all discoverable material requested by Mr. Surti to

which Mr. Surti was entitled, including creating additional CAD drawings specifically requested by Mr. Surti.  Fleet did not engage in tactics to increase the costs of this suit.  Fkeet acted with good faith and reasonably.  This is not a case for willful infringement or where enhanced damages are appropriate.

## IV.     DAMAGES

"The starting point [for a damages inquiry] is 35 U.S.C. § 284, which limits damages to those 'adequate to compensate for the infringement.'"  *Finjan, Inc. v. Blue Coat Sys.,* 879 F.3d 1299, 1309 (Fed. Cir. 2018).  "Two categories of compensation for infringement are the patentee's lost profits and the 'reasonable royalty he would have received through arms-length bargaining.'"  *Id.* (citations omitted).  Mr. Surti does not have an expert to opine on any damages theory.

### A.     MR. SURTI CANNOT MAKE A CASE FOR LOST PROFITS

"[I]f the patentee is not selling a product, by definition there can be no lost profits." *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1548 (Fed. Cir. 1995)(en banc). "[T]he patentee needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004). Mr. Surti is the patentee and owner of the '755 Patent; he has not assigned the '755 Patent to Mudguard. Mr. Surti himself does not practice the invention of his patent and cannot establish any profits he personally has lost and is not entitled to lost profits.

### B.     MR. SURTI MAY RECOVER A REASONABLE ROYALTY

A prevailing patentee is entitled to damages "no less than a reasonable royalty." Nonetheless, there are limitations to a reasonable royalty.  Because damages in a patent case are to be "adequate to compensate for the infringement," 35 U.S.C. § 284, "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement,"

such as, for example sales of non-infringing products.  *Astrazeneca AB v. Apotex Corp,* 782 F.3d 1324, 1343-1344 (Fed. Cir. 2015).  Further, a prevailing patentee is not necessarily entitled to a reasonable royalty award that is greater than zero.  A jury may award a reasonable royalty of zero "when the record supports a zero royalty award," such as when "a case completely lack[s] any evidence on which to base a damages award."  *Apple, Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1328 (Fed. Cir. 2014).

In determining a reasonable royalty, some of the kinds of factors that are to be considered are:

(1) The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty

(2) The rates paid by the licensee for the use of other patents comparable to the patent-in- suit.

(3) The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

(4) The licensor's established policy and marketing program to maintain his or her patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

(5) The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6) The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items, and the extent of such derivative or convoyed sales.

(7) The duration of the patent and the term of the license.

(8) The established profitability of the product made under the patents, its commercial success, and its current popularity.

(9) The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

20

(10) The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

(11) The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

(12) The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

(13) The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(14) The opinion and testimony of qualified experts.

(15) The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)

No one factor is dispositive other factors which would have increased or decreased the royalty Fleet would have been willing to pay and Mr. Surti would have been willing to accept, acting as normally prudent business people, can be considered.

Fleet brought this suit in 2012.  Mr. Surti had *years* to introduce evidence related to a reasonable royalty.  Mr. Surti has no expert to opine on reasonable royalty.  Mr. Surti has not identified any documents or other material on which a reasonable royalty would be based.

## V.    CONCLUSION

For the reasons set forth above, Fleet intends to persuade the jury that there is no infringement of Mr. Surti's patent, that it certainly did not act willfully toward it, and Mr. Surti can make no case of compensatory damages in this trial.

Respectfully submitted,

Date:    September 10, 2021        By:        *s/ G. Thomas Williams*
G. Thomas Williams (P53734)
**MCGARRY BAIR PC**
45 Ottawa Avenue SW, Suite 700
Grand Rapids, MI 49503
Tel: 616/742-3500
Fax: 616/742-1010
*Counsel for Plaintiff*